**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 20-cv-3298

JOSE SARIÑANA GANDARA,

      Plaintiff,

v.

CITY OF WESTMINSTER;
JESSE COHEN, in his individual capacity;
JUDE PEREZ, in his individual capacity; and
JOSHUA BERZANJI, in his individual capacity,

      Defendants.

---

## COMPLAINT & JURY DEMAND

---

      Plaintiff Jose Sariñana Gandara, by and through undersigned counsel, Olivia Kohrs of Novo Legal Group, LLC, hereby alleges for his Complaint and Jury Demand as follows:

## I.   INTRODUCTION

      1.     A little after midnight on November 4, 2018, Westminster Police Department officers reported to the home of Jose and Araceli Sariñana, where the couple lived with their minor children, for a non-emergency. The officers barged into Mr. Sariñana's home and without trying to ascertain what the situation was or communicate effectively with Mr. Sariñana at all, attacked him while his wife and son watched in terror, unable to stop the officers' assault from happening.

      2.     That night, Mrs. Sariñana had called 911 minutes before the officers arrived to report that Mr. Sariñana was intoxicated and to ask only for the phone number to contact a detox facility for Mr. Sariñana. She emphasized to the dispatcher that the issue was not an emergency.

3.      When officers arrived, Mr. Sariñana was seated in the living room. He opened the door for them and asked the officers if they spoke Spanish, to which they replied, "No. Do you speak English?" Mr. Sariñana responded, "No." He then asked in the best English that he could, "What's happening? I'm not doing anything bad. I am in my house."

4.      Without responding or otherwise informing the family why they were in the home, one officer rushed Mr. Sariñana, grabbed his arm, and began kneeing him in his abdomen. Mr. Sariñana screamed, "What are you doing?" He fell to the floor and asked, "Why are you hitting me?"

5.      As he tried to stand up, another officer attempted to take Mr. Sariñana to the floor again. The officers were shouting commands in English at Mr. Sariñana, but neither he nor Mrs. Sariñana, who speak Spanish, fully understood what the officers were saying.

6.      The couple's son, just eleven at the time, witnessed the officers using force on his father and began sobbing and pleading with them to stop hurting his dad.

7.      Mr. Sariñana, Mrs. Sariñana, their son, and Mr. Sariñana's cousin, who was also present, kept insisting that they were in their own home, that they were doing nothing wrong, and that the officers did not need to hurt Mr. Sariñana.

8.      They begged the officers to stop using force, but the officers continued to wrestle Mr. Sariñana to the floor while aggressively shouting commands at Mr. Sariñana in English that neither he, nor any of the adults present in the home, could fully understand.

9.      Suddenly, one of them pulled out his Taser and deployed in on Mr. Sariñana—while he was in a seated position and posing no threat—as another wrenched Mr. Sariñana's arm

violently behind his back. The officers continued to shock Mr. Sariñana as they handcuffed him and placed him under arrest.

## II.  JURISDICTION AND VENUE

10.     Mr. Sariñana brings his claims pursuant to 42 U.S.C. § 1983 and the Constitution and laws of the United States.

11.     This Court has subject matter jurisdiction for those claims pursuant to 28 U.S.C. § 1331.

12.     Venue is proper in this District under 28 U.S.C. § 1391(b). The events and omissions giving rise to the claims asserted in this action occurred within the District of Colorado.

13.     Jurisdiction supporting Mr. Sariñana's claim for attorney's fees and costs is conferred by 42 U.S.C. § 1988.

## III. PARTIES

**Plaintiff**

14.     At all times relevant to the subject matter of this litigation, Plaintiff Jose Sariñana Gandara ("Mr. Sariñana") was a resident of and domiciled in the State of Colorado.

**Defendant**

15.     Defendant City of Westminster is a Colorado municipality. Defendant City of Westminster is responsible for the policies, practices, supervision, training, and final decision-making of the Westminster Police Department and its officers. Defendant City of Westminster was at all times relevant to this Complaint the employer of Defendant Officers Jesse Cohen, Jude, Perez, and Joshua Berzanji, and was in control of supervision and oversight of the officers during their tenure.

16.     Defendant Jesse Cohen was at all times relevant to this Complaint employed as a police officer for Defendant City of Westminster, located in the State of Colorado. Defendant Cohen was acting under color of state law in his capacity as a police officer. Mr. Sariñana seeks relief from Defendant Cohen in his individual capacity.

17.     Defendant Jude Perez was at all times relevant to this Complaint employed as a police officer for Defendant City of Westminster, located in the State of Colorado. Defendant Perez was acting under color of state law in his capacity as a police officer. Mr. Sariñana seeks relief from Defendant Perez in his individual capacity.

18.     Defendant Joshua Berzanji was at all times relevant to this Complaint employed as a police officer for Defendant City of Westminster, located in the State of Colorado. Defendant Berzanji was acting under color of state law in his capacity as a police officer. Mr. Sariñana seeks relief from Defendant Berzanji in his individual capacity.

## IV. STATEMENT OF FACTS

### The 911 Call

19.     Shortly after midnight on November 4, 2018, Westminster Police Department officers responded to a non-emergency 911 call at the home of Jose and Araceli Sariñana, where the couple lived with their two minor children. The officers entered Mr. Sariñana's home and attacked him while his wife, son, and cousin watched in terror, unable to stop it from happening.

20.     Earlier that night, Mr. Sariñana was drinking in his living room and listening to music with his cousin.

21.     It was starting to get late, and Mrs. Sariñana was concerned that Mr. Sariñana's music was going to disturb the neighbors. She didn't want to cause any trouble with them by being too loud, so she asked Mr. Sariñana to stop drinking, turn off the music, and go to sleep.

22.     Mr. Sariñana did not share Mrs. Sariñana's concerns; he was listening to music in his own home and did not believe that he was bothering anyone.

23.     Mrs. Sariñana, who never felt threatened by her husband, just wanted to get some help to quiet her husband down. She wanted them all to get some sleep and avoid any trouble with their neighbors, but she didn't know who to turn to for help.

24.     Mrs. Sariñana told Mr. Sariñana that if he didn't stop drinking and go to sleep she would call the police and ask them to take him to a detox facility for the night so that they could quiet down and get some sleep. Mrs. Sariñana knew of a relative who had been taken to a detox facility for the evening once without issue, and believed that this could be requested.

25.     Although the situation was not an emergency, Mrs. Sariñana called the only number she knew to get help and information—911.

26.     When Mrs. Sariñana, who only speaks Spanish, called the dispatcher, the dispatcher noted that Mrs. Sariñana was Spanish-speaking only and got an interpreter on the line to help interpret their conversation.

27.     Mrs. Sariñana, through the interpreter, calmly told the dispatcher that her husband had been drinking and emphasized to the dispatcher that the issue was not an emergency. She asked the dispatcher for the phone number to contact a detox facility for Mr. Sariñana.

28.     The dispatcher responded by asking Mrs. Sariñana various standard questions about what was going on in the Sariñana home.

29.     Over the course of the 911 call, Mrs. Sariñana told the dispatcher repeatedly that she was not calling about an emergency.

30.     She told the dispatcher that Mr. Sariñana, her husband, had been drinking and that she just didn't want him to be there at the moment. She calmly attempted to explain the non-emergency situation to the dispatcher, and the interpreter interpreted her explanation to mean that Mr. Sariñana causes problems or "throws tantrums" when he has been drinking. Mrs. Sariñana reiterated to the dispatcher that she just wanted the number to call someone else to help her so that she did not have to call 911. The dispatcher said that they could get that for her, but that they would also send some officers over to help her out.

31.     Mrs. Sariñana told the dispatcher that her two children were in the house, their daughter, eight years old, and their son, ten years old (though he had recently celebrated his birthday and was actually eleven at the time).

32.     Notably, she told the dispatcher that Mr. Sariñana did not have any weapons.

33.     She again reiterated that she was just calling to prevent anything from happening. The dispatcher told her that she understood that, but that those were just the general questions that they ask to make sure their officers stay safe.

34.     While on the phone, Mr. Sariñana entered the room talking and Mrs. Sariñana set the phone down, presumably while she spoke with him.

35.     The dispatcher told Mrs. Sariñana that there were officers on the way.

***The Police Response and Assault of Mr. Sariñana***

36.     Shortly after Mrs. Sariñana's call, Defendant Cohen and Defendant Perez, two Westminster police officers, responded to Mr. and Mrs. Sariñana's home. They had been advised that the caller spoke Spanish only.

37.     At that time, Mr. Sariñana was in the living room of the home, Mr. Sariñana's cousin was asleep on the couch in the living room, Mrs. Sariñana was in the next room, and their two children were asleep in their rooms.

38.     Defendant Cohen and Defendant Perez knocked on the door, and Mr. Sariñana opened it for them and let them in. He didn't know why they were there, but he knew he hadn't done anything wrong.

39.     Defendant Cohen and Defendant Perez entered the home but did not acknowledge Mrs. Sariñana to ask her what was going on or why she called. Instead, they immediately went to Mr. Sariñana and began questioning him.

40.     Mr. Sariñana was confused. He had been listening to music and, although he knew that Mrs. Sariñana told him that she was going to call the police if he didn't stop drinking and go to sleep, he hadn't known that she had actually called 911.

41.     Mr. Sariñana, who speaks only Spanish, did not know what was going on. He thought that maybe the police had been in the area and were there to tell him to turn down the music—he didn't think his music was too loud, but he knew that at night the sound carried and the neighbors might be able to hear it a little bit more.

42.     He asked Defendant Cohen and Defendant Perez if they spoke Spanish, to which they replied, "No. Do you speak English?" Mr. Sariñana responded, "No." He then asked in the best English that he could, "What's happening? I am not doing anything bad. I am in my house."

43.     The officers asked Mr. Sariñana for his. Mr. Sariñana answered Defendant Cohen and Defendant Perez's questions as best he could.

44.     With his limited knowledge and understanding of English, he could understand enough to answer with his name, and to try to tell them that everything was fine, but not enough to understand why the officers were in his home.

45.     Defendant Cohen and Defendant Perez did not offer to get an interpreter or try to wait until someone who spoke Spanish could arrive to ensure that Mr. Sariñana actually understood what they were saying to him. Instead they just kept saying things in English to Mr. Sariñana, who could not understand them.

46.     In their own reports about what ensued, Defendant Cohen and Defendant Perez said that Mr. Sariñana started walking toward them wearing a jacket with his hands in his pockets when he opened the door. When Defendant Cohen directed Mr. Sariñana, by pointing, away from Mrs. Sariñana, he complied by moving away, but Defendant Cohen, contradictorily, stated that he believed that Mr. Sariñana was moving "as if he was going to confront me."

47.     Defendant Cohen defended his decision to search Mr. Sariñana, before attempting to effectively communicate with Mr. Sariñana, or to de-escalate the situation that the Officers themselves escalated, by stating that Mr. Sariñana was wearing a jacket which covered most of his torso, including the waistband, "which is a common area where people hide weapons."

48.     He justified his actions in his report in this way despite the fact that it was the middle of the night in November so most people would likely be wearing jackets, Mrs. Sariñana had calmly reported to the dispatcher that there was no emergency and that Mr. Sariñana did not have any weapons, and after Mr. Sariñana had complied with Defendant Cohen's command to move away from Mrs. Sariñana as best he could with his limited understanding of English.

49.     Defendant Cohen and Defendant Perez started trying to grab Mr. Sariñana and bend his hands back while yelling commands at him in English that Mr. Sariñana could not understand. Defendant Perez reported that at this point "the fight was on."

50.     Mr. Sariñana immediately realized that the police were not there to tell him to turn his music down. He could tell that they wanted something from him, but he did not know what because he still didn't know why they were even there.

51.     He was afraid and kept trying to ask them why he was being arrested if he was just in his own house listening to music.

52.     Mr. Sariñana didn't want the police to keep grabbing and hurting him, so he pulled his hands near his body and tried to stay still while Defendant Cohen and Defendant Perez tried to bend his hands back.

53.     Without attempting to communicate with anyone in the home, and without attempting to de-escalate the situation in any way, despite Mr. Sariñana clearly not speaking or understanding English, Defendant Cohen and Defendant Perez instead escalated their violence and aggression.

54.     Defendant Cohen grabbed Mr. Sariñana from the side, utilized a straight arm bar takedown, and threw him onto the couch. Mr. Sariñana screamed, "What are you doing? Why are you hitting me?"

55.     Defendant Cohen, still holding Mr. Sariñana, fell with him. He began hitting Mr. Sariñana with the arm not holding him.

56.     Defendant Perez then approached Mr. Sariñana and began hitting him as well.

57.     Mrs. Sariñana stood watching, horrified at what she was witnessing and kept trying to tell Defendant Cohen and Defendant Perez that there wasn't any problem. She pleaded with them in Spanish, telling them that nothing was wrong and that they did not need to hit her husband.

58.     Unable to get Defendant Cohen and Defendant Perez to listen to her pleas, she began to record the encounter on the camera of her cell phone.

59.     When Defendant Cohen and Defendant Perez released Mr. Sariñana from their grip, he got up and his nose was already bleeding.

60.     Defendant Cohen and Defendant Perez continued to push Mr. Sariñana around in the living room and strike him while Mr. Sariñana, still confused, tried to ask them what was going on and why they were hitting him.

61.     Mr. Sariñana's cousin, who had been in the room asleep on the couch, woke up during the commotion and saw Mr. Sariñana being hit and grabbed by Defendants Cohen and Perez.

62.     Confused, Mr. Sariñana's cousin began trying to figure out what was going on. All he could see was that the officers were hurting Mr. Sariñana and he panicked.

63.     Although he, too, only spoke Spanish, Mr. Sariñana's cousin started yelling at the officers to stop beating Mr. Sariñana. He raised his hands above his head and tried to position himself in between the officers and Mr. Sariñana. All he could say over and over was, "Stop, stop, stop!"

64.     Mr. Sariñana's cousin told the officers, with hands still raised, that they did not need to hit Mr. Sariñana and that Mr. Sariñana was not doing anything. The officers did not listen to these pleas and began hitting Mr. Sariñana's cousin as well.

65.     Defendant Perez struck Mr. Sariñana in the shin and head with his flashlight. He reported that he was justified in doing so because Mr. Sariñana was attempting to swing at him and push Defendant Perez off of him. Defendant Perez struck Mr. Sariñana in the head again and pulled out his Taser.

66.     During this time, more officers, including Defendant Berzanji, arrived to Mr. Sariñana's home.

67.     It was only then that, finally, one of the officers, Defendant Berzanji, happened to speak Spanish. Still, no one told Mr. Sariñana what was going on.

68.     Defendant Berzanji joined Defendant Cohen and Defendant Perez in continuing to hit and grab Mr. Sariñana.

69.     Mr. Sariñana fell to the floor while the officers either continued to hit and kick him, or just watched, doing nothing.

70.     Once Mr. Sariñana struggled back up onto his feet, he crawled into a seated position in a chair in the living room and tucked his hand down by his sides.

71.     Mr. Sariñana's cousin tried to stop the officers from hurting Mr. Sariñana again by positioning himself between Mr. Sariñana and the officers, pleading again with the officers, hands raised, to stop hitting Mr. Sariñana.

72.     Although still seated in the chair, outnumbered, and not posing a threat, the Defendant Officers reported that Mr. Sariñana kept fighting.

73.     Defendant Perez deployed his taser into Mr. Sariñana's back and Mr. Sariñana collapsed onto the floor while Defendant Berzanji wrenched Mr. Sariñana's arm violently behind his back in an arm bar.

74.     Mr. Sariñana laid face down on the floor while the officers continued pushing and kicking him.

75.     Mr. Sariñana's hands were twisted behind his back as Defendant Berzanji continued yelling commands at Mr. Sariñana. These commands from Defendant Berzanji were finally in Spanish so Mr. Sariñana could understand them. He attempted to comply but Mr. Sariñana struggled, physically, to carry out these commands because of his position and the pain he was in from being hit and shocked.

76.     While Mr. Sariñana was on the ground, Defendant Perez tased him again and shocked him with his drive stun in the back of the leg.

77.      Mr. Sariñana was in extraordinary pain and did not know what to do. It never crossed Mr. Sariñana's mind to hurt anyone. He thought the police had just been passing by and stopped to talk to him about his music.

78.     Defendant Perez was shocking him and, reflexively, Mr. Sariñana was trying to move away. He still did not understand why they kept hitting and shocking him when he had not done anything.

79.     Mr. Sariñana tried to put his hands on his back to push the taser away from him to keep the officers from shocking him anymore.

80.     At some point during this assault, the yelling and screaming woke Mr. Sariñana's son, who was eleven years old at the time, up. He came into the living room and was terrified by what he saw.

81.     He began sobbing and screaming at the officers to stop hurting his father. The officers told Mr. Sariñana's son not to worry because Mr. Sariñana was fine, even as they continued to hit and shock Mr. Sariñana.

82.     Mr. Sariñana's son, who spoke English, pleaded with the officers to listen to him as he told them that nothing was wrong and that his dad hadn't done anything while his mother yelled at the officers in Spanish saying the same thing.

83.     Mr. Sariñana's son repeatedly yelled, "Stop, stop, please! You're hurting him, you're hurting him!" but no one listened.

84.     Mr. Sariñana begged the officers to stop hurting him, and told them, in Spanish, that he would do whatever they wanted him to do if they just stopped hurting him.

85.     Mr. Sariñana was in extraordinary pain but he did not want his son to have to see him like that. He tried to pull himself together for the sake of his son and attempted to reassure his son as best he could that he was okay.

86.     Defendant Berzanji handcuffed Mr. Sariñana and asked him to stand up. Mr. Sariñana attempted to comply but was in so much pain from the assault—in his legs, all over his body—that he had a hard time doing so.

87.     While one of the officers helped him up, Defendant Perez continued to yell at Mr. Sariñana in English. He yelled that Mr. Sariñana was lucky that they hadn't shot him.

88.     Mr. Sariñana asked Defendant Berzanji, in Spanish, what Defendant Perez had said. Defendant Berzanji told Mr. Sariñana to be grateful that they did not shoot him.

89.     Mr. Sariñana was shocked. He did not understand what they could have possibly shot him for, and was terrified, still, that they were going to shoot him.

90.     He told himself not to say anything else because he did not want the officers to shoot him.

91.     The officers directed Mrs. Sariñana and her son into another room while they escorted both Mr. Sariñana and his cousin out of the house in handcuffs.

92.     When the officers brought Mr. Sariñana out of the house, they ordered Mr. Sariñana to walk faster, which he could not do because of how much pain he was in.

93.     One of the officers pushed him in the back to get him to speed up. Mr. Sariñana looked back but did not say anything—he was still afraid that the officers might shoot him.

94.     Finally, and far too late, Defendant Berzanji talked to Mrs. Sariñana to ask her what was going on. Mrs. Sariñana told him exactly what she had told the dispatcher—that she had not called about an emergency and that she only called 911 because she didn't have any other number to call and was hoping that someone would be able to provide her with a phone number for a detox facility. She told him Defendants Cohen and Perez immediately rushed in and began hitting Mr.

Sariñana as soon as they got there without talking to her first, and that she never would have called 911 if she knew that this was going to happen.

95.    Mr. Sariñana had not at any time threatened the Defendant Officers.

96.    He did not have possession of any weapons during his interaction with the officers, and Mrs. Sariñana had told the dispatcher this.

97.    He did not pose an imminent threat of death or serious bodily injury to the Defendants or to anyone else.

98.    The events that occurred were not recorded on any body cameras because the City of Westminster has chosen not to supply their officers with body cameras. Luckily for Mr. Sariñana, Mrs. Sariñana was able to capture some of the assault on her own personal cell phone camera.

### Mr. Sariñana's Injuries

99.    During this assault, Defendant Officers struck Mr. Sariñana all over his body including his legs, head, face, stomach, arms, and back. The Defendant Officers hit, kicked, pushed, grabbed, tasered, and shocked Mr. Sariñana through the course of this assault.

100.    His pain was very severe in his legs, head, arm, back, nose, and jaw.

101.    Even during the assault, he was in so much pain that he had a hard time physically complying with Defendant Officers' commands to move, stand up, or put his arms behind his back.

102.    When an officer placed Mr. Sariñana in the patrol car his already painful body started to hurt more and more.

103.    The police officer that removed the taser prongs from Mr. Sariñana's back reported that Mr. Sariñana had blood around his nose and was experiencing pain in the right side of his head and had a visible bump on his forehead, and was experiencing pain throughout his upper right arm.

104.    He was crying from the pain as he told the officers that he was worried he was seriously hurt.

105.    He asked the police officers to check him to make sure he was alright, and the police officers took him to the hospital to be evaluated and treated for his injuries.

106.    At the hospital, doctors took photographs of his injuries and upon information and belief took x-rays of his leg and elbow.

107.    Mr. Sariñana was in extreme pain and walked with a limp for a month before his injuries began to heal.

108.    During that time, he tried to do everything that he could to ease his pain.

109.    To this day, his leg still cracks when he bends and unbends it.

110.    Mr. Sariñana's physical injuries were not the end of the pain and suffering that this assault caused.

111.    The assault escalated quickly but felt like it was never going to end. Mr. Sariñana did not know how long it was going to last.

112.    He felt confused and scared because he did not understand what he did to have the police in his home in the first place, let alone what he did to warrant such a violent response from the police.

113.    During the assault Mr. Sariñana could not stop thinking about his family. He was terrified of losing them.

114.    It took months for Mr. Sariñana to process what the Defendant Officers did to him and how they hurt him, and he is still working to heal from it today.

115.    For months, Mr. Sariñana was depressed. He lost sleep at night because he could not stop thinking about what the police had done to him. He was continually reliving that night.

116.    Thinking about what happened to him that night makes Mr. Sariñana sad.

117.    Mr. Sariñana still feels disbelief that something like that could happen. He never imagined that he would go through the pain and sadness that resulted from that night.

118.    Mr. Sariñana's family and his relationships with them have not been the same since.

119.    He feels guilty for putting his family through the assault, even though it was the result of something he had not done.

120.    In addition to losing trust in the police, the family lost trust in each other.

121.    Both the assault, and the healing process following the assault put a strain on their relationships with each other as everyone did their best to try to comprehend what happened that night.

122.    Mr. Sariñana does not stop thinking about what he, his wife, and his son went through.

123.    Both Mrs. Sariñana and their son were traumatized. They have since attended therapy to try to make sense of, and heal from, the violence they witnessed at the hands of the police against their husband and father.

124.    Whenever Mr. Sariñana's son sees the police now, he starts to tremble. When he was younger, he wanted to be a firefighter but after that night and witnessing what the police officers did to his father, that is no longer his dream.

***The City of Westminster's Pattern and Practice of Excessive Force***

125.    This is not the first time that the City of Westminster, through its police officers, have demonstrated a pattern and practice of using excessive force, or that it's officers have used their reports to tell a distorted version of events that best serves their interests and justifies their escalatory actions.

126.    For example, on August 18, 2010, Westminster officers used unnecessary force on Trenton Lane, an eleven-year-old-boy with autism syndrome. He was taken to be treated by mental health professionals at Hidden Lake Mental Health Office (HLMHO) in Arvada, Colorado. Before entering, the boy had become fearful and uncooperative; he threw a tantrum and refused to go into the office. As a result, staff at HLMHA called for an ambulance to provide assistance for the boy to be brought into the facility and alleviate his fears. An ambulance and the Westminster Police arrived. By that time, Lane was calm and crawling around on the lawn while under the supervision of his mother and grandmother. One officer yelled at the boy to stop crawling on the grass, but the child did not respond. Even though the boy had not committed any crime, nor had he threatened anyone, the officer forcefully seized him by lifting him into the air by his neck and t-shirt and struck him in the back. The boy's mother pleaded with the officer that the boy was having medical and mental health issues, but the officer continued to use force, including application of a jugular notch nerve pressure point, intended to cause pain. The officer, along with three other officers, then placed handcuffs on the boy. When the mother sough to make a complaint, the officer involved retaliated by filing false criminal charges. A third-party physician witness provided affidavit testimony making clear that he observed the officer retaliate with the false charges and false account.

127.     As a result of this incident, the Westminster officers involved were sued for using excessive force and First Amendment retaliation.[1] The City of Westminster adopted the officers' version of events and asserted the conduct was justified and within policy. It did not discipline or retrain the officer involved to de-escalate the possible need for force. As a result, the officers learned that the City of Westminster would assume their account of violence was justifiable, despite evidence to the contrary, and protect them.

128.     On July 27, 2016, Westminster police used unnecessary force on a sixteen-year-old boy who was suffering an emotional episode after the Department of Human Services (DHS) sought to remove him from his family. Emiliano Archuleta was contacted by DHS in his home and officers from the Westminster Police Department accompanied them. After DHS informed the mother that the children were to be removed, officers sought to "clear the area." Mr. Archuleta became verbally non-responsive as he put his head down and became quiet in the kitchen. Instead of being sensitive to the juvenile's concerns and emotionally distressing situation, three Westminster officers grabbed Mr. Archuleta, violently threw him to the ground, and repeatedly struck Mr. Archuleta in the head and back. The officers asserted that the force was necessary because the child obstructed the police officers. Mr. Archuleta suffered injuries to his arm and face, but an officer claimed he only harmlessly struck Mr. Archuleta in the shoulder to gain compliance. Mr. Archuleta was charged with obstructing police officers, but the charges were later dismissed.

---

[1] Federal Civil Rights Case No. 12-cv-2196-MSK-KLM.

129.    As a result of the Archuleta incident, the officers involved were sued for using excessive force and malicious prosecution.[2] Again, the City of Westminster adopted the story told by the officers and asserted the conduct was within policy. It hired private attorneys to defend the action, and did not discipline or re-train the officers to implement de-escalation techniques instead of force, to be more conscious of the sensitive emotional state of the boy or persons to whom the officers may come into contact, or to curb the false allegations of the officers. As a result, the City of Westminster reinforced for its officers that the City would fully back their account of incident, and accept the premature and unnecessary violence, despite evidence to the contrary, to protect them.

130.    On January 14, 2014, two Westminster officers unnecessarily used force on an unarmed and non-threatening, cooperative woman, multiple times, in one encounter. The officers arranged to arrest Jennifer Dees, who had been accused of violating a protective order by sending an email. Ms. Dees had recently been through gastric surgery and had a G-tube protruding from her stomach. While she waited for the Westminster officers to arrive, other officers from a neighboring jurisdiction were already in her home. The Westminster officers arrived and ordered her to turn around. As she began to do so slowly (due to her condition), the primary Westminster officer in charge grew impatient and whipped her around the opposite direction she was turning her body, which displaced the gastric tube and caused whiplash-type injury to her shoulder. Officers placed handcuffs on Ms. Dees in an extremely tight manner that caused her wrists to bleed, and then pushed her into the police vehicle backwards in a manner that caused her to hit the back of her neck on the squad car, leaving a clear bleeding wound where her neck was struck.

_____

[2] Federal Civil Rights Case No. 18-cv-01890-DDD-MEH

Despite the clear evidence to the contrary, the officers claimed that they did not use any force on Ms. Dees and did not do anything that could have harmed her.

131.   As a result of the Dees incident, the Westminster officers were sued for using excessive force.[3] Despite medical evidence, photographs, and the obvious injuries/illness to Ms. Dees, the City of Westminster adopted the story told by the officers and asserted the conduct was justified and within policy. It hired private attorneys to defend the action, and did not discipline or re-train the officers to implement de-escalation techniques, to be more conscious of the sensitive physical or emotional state of those to whom the officers may come into contact, or to otherwise curb the use of premature force or the false allegations of the officers. As a result, the City of Westminster communicated to its officers that the City would assume its officers' account of incident to be correct, despite evidence to the contrary, without forcing its officers to account for the discrepancies.

132.   On August 10, 2016, two Westminster officers used premature, unjustified force, on an unarmed and non-threatening man, David Martinez. Westminster sought to arrest the man outside of his tattoo shop in Thornton, Colorado. The officers waited for Mr. Martinez to walk outside, light a cigarette, and turn his attention away, before rapidly running up behind Mr. Martinez for a surprise assault. Without communicating that the men were police, and without provocation, the officers stiff-armed Mr. Martinez in the throat, knocked him back onto a nearby railing, and viciously pummeled Mr. Martinez in the face and head with a beating so severe that Mr. Martinez required surgery. The officers falsely asserted afterward that the conduct was

---

[3] Federal Civil Rights Case No. 16-cv-00021-WYD

necessitated by Mr. Martinez' resistance. However, Mr. Martinez had a security camera that captured the entire assault, and which completely refuted the false account given by the officers.

133.    As a result of the Martinez incident, the officers were sued for using excessive force.[4] Martinez demonstrated through his security video from the tattoo shop that the officers used force against an unarmed and non-threatening man, which contradicted the officers' accounts. But the City of Westminster adopted the officers' account of the incident and asserted the conduct to be within policy. It hired private attorneys to defend the action and did not discipline or re-train the officers to refrain from using force unnecessarily, or to curb the false allegations of the officers. Neither officer was disciplined for the unnecessary assault or for the false account they gave about it afterward. As a result, the City of Westminster reinforced for its officers' that the City would assume false accounts by its officers to be correct, despite contrary evidence, and will act to protect them without forcing them to account for the discrepancies.

134.    On November 11, 2017, Westminster Police officers used force on an unarmed, handcuffed man. Officers arrested Dominic Casement for fleeing a car believed to have run a red light. While Mr. Casement was seated on the ground with his hands cuffed behind him, a Westminster officer struck Mr. Casement with a pistol across the back of Mr. Casement's head and across Mr. Casement's chin, causing severe bloody wounds. In this unusual case, the officer was prosecuted for the assault by the 17th Judicial District Attorney—but only after another officer came forward and complained about his fellow officers' conduct. It is believed that Westminster did not discipline the officer who perpetrated the assault. When pressed by the media, the City would not answer questions about whether the officer was permitted to resign, instead of or in

---

[4] Federal Civil Rights Case No. 18-cv-00265-STV

addition to disciplining him, which suggests the City permitted him to leave the department voluntarily without discipline. Media outlets reported that the State of Colorado had to revoke the officer's certification to ensure that the officer would not be hired again.[5] By not taking action to remove the officer, the City of Westminster reinforced for its officers' that the City would act to protect them without forcing them to account.

135.    Although in this instance, Mr. Sariñana was lucky enough that Defendant Perez did not carry out his threat that Mr. Sariñana was lucky the officers did not shoot him, Westminster officers have gone so far as to shoot and kill people with their use of excessive, deadly force.

136.    On September 20, 2016, a Westminster Police officer shot and killed Thomas Tucker in the back as he ran away from the officers. Westminster and several other neighboring law enforcement agencies pursued Tucker, whom they believed was involved in a robbery in the City of Westminster. Officers described a tense car chase that led to a foot chase, and which finally resulted in a confrontation during which Tucker pulled out a knife and positioned himself in a fighting stance within 10-15 feet of an officer. Westminster officer Stroup fired four shots, killing Tucker. However, at least two witnesses reported that Tucker was shot while running away from the officers, not toward them. The autopsy analysis demonstrated that Tucker suffered several gunshot wounds in his back. This evidence was inconsistent with the officers' accounts, but like the other cases, Westminster did not discipline its officers for the faulty accounts.

137.    On June 26, 2018, Westminster officers shot unarmed driver Ronald Romero. Officers followed Romero after receiving a report of a burglary in the area. The officers

---

[5] See https://kdvr.com/2019/12/03/man-with-fractured-jaw-sues-westminster-police-for-excessive-force/

coordinated with each other to cut him off. Officers claimed that Romero appeared to swing wide with his vehicle, cross over a double yellow lane, and drive directly toward an officer on a motorcycle before the officer fired three shots at Romero, striking him once in the head. Officers claimed that the force was necessary to prevent Romero from ramming an officer, despite the fact that they did not attempt to pull over the vehicle, and the vehicle was traveling only 35mph. Most troubling, the forensic evidence demonstrated that Romero was shot in the back of the head, with a bullet trajectory going back to front, instead of front to back, as would be suggested by the officers' accounts.[6]

138.   Consistent with other cases, the City of Westminster did not discipline the officers for using excessive force, failing to use less-lethal force, or for providing false or erroneous accounts. The City of Westminster ignored physical evidence that contradicted the officers' accounts and accepted the officers' word that the force was necessary. Again, this sent the signal to Westminster officers that they will be backed up by the City regardless of the truth.

139.   On August 25, 2018, a Westminster officer shot and killed an unarmed man in mental distress. Birenda Thakuri had a mental health crisis, where he believed he had been poisoned and began hearing things. He paced around holding his head in his hands as he moved in and out of traffic on Federal Boulevard as his brother, who was with him, tried to help calm him and get him under control. Mr. Thakuri became upset and yelled at his brother before kneeling in a patch of grass beyond the sidewalk, ripping at the grass and putting grass into his mouth. A Westminster officer arrived alone, and observed Thakuri flail his arms, slap his head, and scream

---

[6] See DA decision letter, here: https://www.jeffco.us/DocumentCenter/View/15550/18-001-WETAdams-Decision-Letter-Officer-Involved-Shooting-06

unintelligibly in a manner that made him believe that Thakuri was suffering a mental health crisis. However, when Thakuri approached the officer—animated and screaming, but unarmed—the officer failed to attempt to de-escalate the excitement, failed to take into account the obvious mental health concerns exhibited by Thakuri, failed to use non-lethal force such as OC spray or Taser to control the situation, did not call for back-up, did not move away from Mr. Thakuri, but instead, shot Thakuri in the chest from about 10 feet away.

140.    The officer and Westminster were sued.[7] Relying on the narrative given by the officer involved, the City of Westminster publicly stated that their officer had acted within policy and the officer was not disciplined or retrained to use less lethal means of control, to implement special precautions for EDP persons, to de-escalate, or otherwise for using deadly force on a person who did not represent an imminent deadly threat. Like many other cases, the City of Westminster issued a public press release grossly misstating the facts of what happened; a press release that was never corrected or modified upon further investigation.

141.    These accounts represent a small number of publicly-known circumstances where Westminster officers have used excessive force without a proportional imminent threat of force facing the officers, without attempting to de-escalate the encounter to minimize the need for violence, and where some officers have misrepresented the circumstances, threats, and/or justification for the force required. In the face of these circumstances, Westminster has consistently adopted the officer accounts, privately and publicly, despite clear contradicting evidence, and has consistently failed to discipline, retrain, and/or otherwise supervise in a manner necessary to bring these officers in line with constitutionally-required standards of reasonableness.

---

[7] Federal Civil Rights Case No. 19-cv-02412-DDD-KLM

142.     When officers have been sued, the City of Westminster has often paid settlements and required that settlement agreements contain confidentiality clauses despite the fact that settlement agreements with the City are supposed to remain available for inspection by the public. This makes such circumstances difficult to track and collect for the public, watchdog groups, and for lawyers because the victims cannot speak out without losing settlement funds they have compromised to obtain. This practice also represents another way that the City of Westminster appears motivated to hide the truth about cases to insulate the City and their officers from liability.

143.     As demonstrated, yet again, by Mr. Sariñana's case, Westminster, through its patterns and practices, fails to properly supervise their officers by not disciplining them when discipline is warranted, by failing to retrain when its officers exercise poor judgment or improper application of policy, and by allowing officers to control the narrative regardless of its truth.

144.     The City's indifference to the truth and lack of corrective supervision advance a culture that permits its officers to act with impunity, without regard for the constitutional restraints on their actions, because they know there will be no ramifications.

145.     This culture permits Westminster officers to presume they can violate the constitution and misrepresent what happened with the expectation that the City of Westminster will back them up.

146.     This presumption is bolstered by the knowledge that Westminster officers are not required to wear body cameras to ascertain the truth of police encounters which, coupled with Westminster's indifference to the truth, blind acceptance of its officers' accounts, and failure to review, investigate, discipline, or retrain, has contributed to a pattern of excessive force without accountability.

147.     It was only through chance and Mrs. Sariñana's split-second decision to pull out her phone and start recording when she realized what was happening that Mr. Sariñana has any evidence, other than the Defendant Officers' self-serving accounts, of what happened that night.

148.     Despite the incidents described above, upon information and belief, from 2012 to 2017 the City did not discipline a single Westminster officer for the excessive use of force.

149.     By persistently failing to adequately investigate, review, criticize, discipline, retrain, and/or otherwise supervise officers who violate the constitution, and by refusing to institute officer body-worn cameras in the face of a pattern of officer misconduct, the City of Westminster has and continued to act with deliberate indifference to those citizens who end up hurt, like Mr. Sariñana, by its officers.

## V.  STATEMENT OF CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983 — Fourth Amendment Violation — Excessive Force
### Against Defendant Officers Cohen, Perez, and Berzanji

150.     Mr. Sariñana hereby incorporates all of the paragraphs of this Complaint as though fully set forth herein.

151.     At all times relevant to this Complaint, Defendant Officers Cohen, Perez, and Berzanji were acting under the color of state law in their capacities as Westminster police officers.

152.     At the time when Mr. Sariñana was unlawfully apprehended and hit, kicked, and shocked by Defendant Officers Cohen, Perez, and Berzanji, Mr. Sariñana had a clearly established constitutional right under the Fourth Amendment to the United States Constitution to be secure in his person from unreasonable seizure through excessive force.

153.    Any reasonable law enforcement officer knew or should have known of this clearly established right.

154.    Defendant Officers Cohen, Perez, and Berzanji engaged in the use of force that was objectively unreasonable in light of the facts and circumstances confronting them, violating Mr. Sariñana's Fourth Amendment rights.

155.    Defendant Officers Cohen, Perez, and Berzanji's actions, as described herein, were motivated by intent to harm Mr. Sariñana.

156.    Defendant Officers Cohen, Perez, and Berzanji's actions, as described herein, were undertaken intentionally, maliciously, willfully, wantonly, and/or in reckless disregard of Mr. Sariñana's federally protected rights.

157.    Defendant Officers Cohen, Perez, and Berzanji unreasonably used excessive force against Mr. Sariñana, resulting in significant injury to Mr. Sariñana.

158.    The acts or omissions of Defendant Officers Cohen, Perez, and Berzanji were the moving force behind and proximate cause of Mr. Sariñana's injuries.

159.    The acts or omissions of Defendant Officers Cohen, Perez, and Berzanji caused Mr. Sariñana damages in that he suffered physical and mental pain during the assault that resulted in him suffering pain throughout his body, including his legs, arms, head, face, stomach and back that caused him difficulty ambulating, among other injuries, damages, and losses.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983 — Fourth Amendment Violation — Unlawful Search of Person**
**Against Defendant Officers Cohen, Perez, and Berzanji**

160.    Mr. Sariñana hereby incorporates all of the paragraphs of this Complaint as though fully set forth herein.

161.    At all times relevant to this Complaint, Defendant Officers Cohen, Perez, and Berzanji were acting under the color of state law in their capacities as Westminster police officers.

162.    The Fourth Amendment to the United States Constitution provides individuals with the right to be free from unreasonable searches of their person.

163.    Any reasonable person in Defendant Officers Cohen, Perez, and Berzanji's position knew or should have known of this clearly established right.

164.    Defendant Officers Cohen, Perez, and Berzanji violated Mr. Sariñana's Fourth Amendment rights by searching his person without having reasonable suspicion to believe he was either armed or dangerous.

165.    Defendant Officers Cohen, Perez, and Berzanji's decision to search Mr. Sariñana was not objectively reasonable in light of the circumstances confronting them.

166.    Defendant Officers Cohen, Perez, and Berzanji's actions were taken intentionally, maliciously, willfully, and/or in reckless disregard to Mr. Sariñana's constitutional rights.

167.    As a direct and proximate result of Defendant Officers Cohen, Perez, and Berzanji's actions, Mr. Sariñana suffered injuries.

### THIRD CLAIM FOR RELIEF
### 42 U.S.C. § 1983 — Fourth Amendment Violation — Failure to Intervene
### Against Defendant Officers Cohen, Perez, and Berzanji

168.    Mr. Sariñana hereby incorporates all of the paragraphs of this Complaint as though fully set forth herein.

169.    At all times relevant to this Complaint, Defendant Officers Cohen, Perez, and Berzanji were acting under the color of state law in their capacities as Westminster police officers.

170.     The Fourth Amendment to the United States Constitution provides individuals with the right to be free from excessive force.

171.     Any reasonable person in Defendant Officers Cohen, Perez, and Berzanji's position knew or should have known of this clearly established right.

172.     Defendant Officers Cohen, Perez, and Berzanji violated Mr. Sariñana's right to be free from excessive force when they failed to intervene to stop the violation.

173.     Defendant Officers Cohen, Perez, and Berzanji observed or had reason to know of such a constitutional violation occuring.

174.     Defendant Officers Cohen, Perez, and Berzanji had a duty to intervene to prevent the use of excessive force by a fellow officer.

175.     Defendant Officers Cohen, Perez, and Berzanji had a reasonable opportunity to intervene.

176.     Defendant Officers Cohen, Perez, and Berzanji failed to intervene.

177.     As a direct and proximate result of Defendant Officers Cohen and Perez's failure to intervene, Mr. Sariñana suffered injuries.

**FOURTH CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**Against Defendant City of Westminster**

178.     Mr. Sariñana hereby incorporates all of the paragraphs of this Complaint as though fully set forth herein.

179.     Westminster officers demonstrate a pattern and practice of use force where there is no imminent threat facing an officer or others, when the situation reasonably calls for de-escalation, and/or where other precautions or less-violent forms of contact should be used such as

taking steps to calm the situation, creating distance, utilizing environmental controls and barriers to help mitigate volatility, and communicating in a non-threatening manner.

180.    Westminster tacitly acquiesced to this pattern and practice by adopting its officers' accounts of incidents—even in spite of contradicting evidence—by failing to discipline, retrain, and/or otherwise supervise its officers.

181.    Westminster has been put on notice about officer misconduct through excessive force lawsuits, evidence that conflicts with officer accounts, and witness accounts that should cast doubt on officer justifications regarding the use of force.

182.    Westminster has continually failed to appropriately investigate, review, discipline, retrain, and/or otherwise supervise its officers to use force within constitutional limits.

183.    Westminster has continually failed to appropriately investigate, review, discipline, retrain, and/or otherwise supervise its officers to curb erroneous accounts and/or intentional misrepresentations regarding officer-involved incidents.

184.    Instead, Westminster has instituted its own policies, customs, and practices, that appear calculated to protect officers and tacitly support its officer employees, regardless of their misconduct, including but not limited to failing to adopt standardized body cameras; requiring civil rights claimants who settle claims of excessive force to keep the facts of such incidents, and the settlements, confidential; and failing to critically review, investigate, discipline, retrain, and/or otherwise supervise in a manner that compels its officers to use and report force within limits that clearly meet appropriate accountability standards.

185.    The City's acquiescence has helped promote a culture in which officers are emboldened to use force faster than appropriate, to overlook alternatives to the use of force, and to misrepresent the facts and justifications for force used in the field.

186.    By persistently failing to adequately discipline, retrain, and/or otherwise supervise officers who violate the constitution, and by refusing to institute officer body-worn cameras in the face of a pattern of officer misconduct, the City of Westminster has and continues to encourage its officers to misuse their authority. The City of Westminster has and continues to act with deliberate indifference to those citizens who have been and/or continue to be hurt or killed by its officers.

187.    This action and inaction of the City of Westminster, as articulated above, has been and continues to be a moving force behind the constitutional injuries suffered by those, like Mr. Sariñana, who encounter Westminster officers.

## VI.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff Jose Sariñana requests respectfully that this Court enter judgment in his favor and against Defendants, and award him all relief as allowed by law and equity, including, but not limited to the following:

a.    Compensatory damages, including but not limited to those for pain and suffering, emotional distress, and other compensable damages in an amount to be determined at trial;

b.    Punitive damages against the individual Defendants in an amount to be determined at trial;

c.    Actual economic damages and consequential damages arising out of Defendants' conduct;

d.  Pre-judgment and post-judgment interest at the highest lawful rate;

e.  Attorney fees and costs; and

f.  Such further relief as justice requires.

**Plaintiff requests a trial to a jury on all issues so triable.**

DATED this 4th day of November, 2020.


Respectfully submitted,

*s/ Olivia Kohrs*
Olivia Kohrs
Novo Legal Group, LLC
4280 Morrison Rd.
Denver, CO 80219
T: 303-335-0250
F: 303-296-4586
E: olivia@novo-legal.com

*Attorney for Plaintiff*